United States District Court
Northern District of California

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        San Francisco Division

11   JEOVANI JACKSON,                    Case No. 24-cv-02630-LB

12              Plaintiff,

13        v.                             **ORDER GRANTING DEFENDANTS'
                                         MOTION FOR SUMMARY
14   JUSTIN HUGHES, et al.,              JUDGMENT**

15              Defendants.              Re: ECF No. 22

16

17                            **INTRODUCTION**

18        Jeovani Jackson, an inmate at the Pelican Bay State Prison who is representing himself, sued

19   correctional officers for their application of handcuffs to his person and for threats of retaliation,

20   allegedly in violation of the Eighth and First Amendments. [1] Defendant correctional officers moved

21   for summary judgment under Fed. R. Civ. P. 56 on the grounds that two of plaintiff's claims are

22   unexhausted, the defendants did not use excessive force when applying handcuffs to plaintiff's

23   person, and the defendants did not threaten the plaintiff. [2] The court grants the defendants' summary

24   judgment motion.

25

26

27   _____

     [1] ECF No. 1. Citations refer to material in the Electronic Case File (ECF).

28   [2] ECF No. 22 ("MSJ").

     ORDER – No. 24-cv-02630-LB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**STATEMENT**

**1.  March 29, 2024 Incident**

On March 29, 2024, Mr. Jackson — who was incarcerated at  Pelican Bay State Prison ("PBSP") — awoke feeling ill and vomited on his cell floor.[3] Mr. Jackson began to "yell[] unintelligibly," and to "roll[] around in [the] large puddle of vomit."[4] An officer responded to Mr. Jackson's shouts and "made a Code 1 medical emergency radio call."[5]

Staff members responded to the medical call.[6] The responding member of medical staff, non-defendant Nurse Hewitt, asked Mr. Jackson to exit his cell so that he could be medically evaluated and Mr. Jackson agreed to do so.[7] Non-defendant Sergeant Fillippa informed Mr. Jackson he would need to submit to restraints before exiting his cell. "Mr. Jackson appeared unable to comply with [Sergeant Fillippa's] order to submit to restraints."[8] Non-defendant Lieutenant Lawrence and Sergeant Fillippa instructed the control booth officer to open the door to Mr. Jackson's cell, and Sergeant Fillippa ordered Mr. Jackson to turn around so that handcuffs could be applied. Mr. Jackson "at first appeared to comply," but then "[s]uddenly . . . swung around and forcefully punched Lieutenant Lawrence in the face with a closed left fist."[9] Lieutenant Lawrence sustained a concussion and a chin wound from Mr. Jackson's punch.[10]

The responding officers ordered Mr. Jackson to "get down." When he failed to comply, Sergeant Fillippa and defendant Candela took Mr. Jackson by the shoulders and pushed him to the floor. Mr. Jackson began to "resist[] attempts to restrain him by thrashing his body around, kicking his legs, and . . . keep[ing] his arms near his sides with his hands pinned under his body." Sergeant Fillippa repeatedly ordered Mr. Jackson to stop resisting, but Mr. Jackson failed to

---

[3] MSJ, Ex. 10 ("Jackson Deposition") at 22:17-22, 25:1-23.

[4] MSJ, Ex. 6 ("Gutierrez Declaration") at ¶ 3.

[5] *Id*. at ¶ 4.

[6] MSJ, Exs. 2–5.

[7] MSJ, Ex. 4 ("Hewitt Declaration") at ¶¶ 7-8.

[8] MSJ, Ex. 3 ("Fillippa Declaration") at 2.

[9] *Id*. at 2-3.

[10] MSJ, Ex. 5 ("Lawrence Declaration") at ¶ 11.

comply. Sergeant Fillippa and defendant Hughes brought Mr. Jackson's arms behind his back, and defendant Hughes applied handcuffs to Mr. Jackson's wrists. [11]

While Sergeant Fillippa and defendant Hughes restrained Mr. Jackson's arms, defendant Candela held down Mr. Jackson's legs and called for leg restraints. Once defendant Candela was handed the restraints, he applied them to Mr. Jackson's ankles. Defendant Candela "used one of [his] thumbs as a spacer to determine the amount of space between [Mr.] Jackson's skin and the leg restraint cuffs."[12]

Defendant Hughes and Sergeant Fillippa helped Mr. Jackson to his feet and assisted him out of the cell. Mr. Jackson was unable to walk and sat down at the top of the stairs outside his cell. The officers tried to put Mr. Jackson on a "medical backboard" so that they could carry him down the stairs, but Mr. Jackson resisted by kicking, thrashing, and screaming. The officers believed Mr. Jackson's medical issue was too urgent to wait for Mr. Jackson to comply, so they carried him down the stairs, with each of the four officers holding an arm or leg, and placed him on a gurney at the bottom of the stairs. While Mr. Jackson was carried down the stairs, he "continued to make incoherent statements and was moving his body around." At the bottom of the stairs, Mr. Jackson was secured to the medical gurney and transported to the medical unit.[13] Defendant Hughes and non-defendant Nurse Hewitt accompanied Mr. Jackson to the medical unit.[14] Defendant Candela did not accompany Mr. Jackson to the medical unit.[15]

At the medical unit, defendant Hughes was relieved by an unidentified staff member, and Nurse Hewitt performed a medical examination of Mr. Jackson.[16] During the examination, Nurse Hewitt "did not . . . find any sign that the restraints had been applied too tightly," and "was able to raise the handcuff and leg restraint bracelets further up [Mr.] Jackson's arms and legs so [she]

---

[11] Fillippa Decl. at ¶¶ 10-12.

[12] MSJ, Ex. 2 ("Candela Declaration") at ¶¶ 7-9.

[13] Fillippa Decl. at ¶¶ 15-19.

[14] MSJ, Ex. 1 ("Hughes Declaration") at ¶ 12; Hewitt Decl. at ¶ 12.

[15] Candela Decl. at ¶ 12.

[16] Hughes Decl. at ¶ 12; Hewitt Decl. at ¶ 13.

United States District Court
Northern District of California

1  could check his wrists and ankles."[17] Mr. Jackson's wrists and ankles presented some

2  discoloration, which Nurse Hewitt erroneously transcribed as dislocation and later corrected.[18]

3       Both defendants, as well as non-defendants Sergeant Fillippa and Nurse Hewitt, state that at no

4  time did Mr. Jackson say his wrist or ankle restraints were too tight, and at no time did any officer

5  threaten Mr. Jackson or state they did not care about any pain or about his safety.[19] In his

6  deposition, Mr. Jackson confirmed that he did not tell any defendant that the restraints were too

7  tight, and that no defendant threatened him or said they did not care about any pain or about Mr.

8  Jackson's safety.[20] Rather, Mr. Jackson testified that after he reached the medical treatment area

9  he complained to an unidentified staff member "about [the] cuffs being too tight," and that this

10  unidentified staff member said he did not care if Mr. Jackson lost his fingers.[21] Mr. Jackson

11  appears only to have complained about the tightness of the wrist cuffs, and not to have mentioned

12  the ankle restraints.[22] Mr. Jackson "do[es]n's know the[] name[]" of the staff member to whom he

13  complained.[23]

14       After he was discharged from the medical unit, Mr. Jackson was placed in restricted housing.

15  He claims that while he was in restricted housing, two non-defendant officers threatened him with

16  bodily harm if he complained about the events of March 29, 2024. Mr. Jackson did not file a

17  grievance about this threat.[24]

18

19

20

21  [17] Hewitt Decl. at ¶ 13; *see also* Jackson Depo. at 58:22-59:2 (confirming that Nurse Hewitt was able
22  to "move [the restraints] up" on both Mr. Jackson's wrists and ankles).

   [18] *Id*. at ¶¶ 15-16.

23  [19] Hughes Decl. at ¶¶ 14-15; Candela Decl. at ¶¶ 13-14; Fillippa Decl. at ¶¶ 20-21; Hewitt Decl. at ¶
24  18.

   [20] Jackson Depo. at 39:8-17; 47:2-7; 48:18-49:2; 54:22–55:4.

25  [21] *Id*. at 57:19-58:5.

26  [22] *Id*. at 57:22-58:5 (stating that Mr. Jackson told the unknown staff member that his "hands [were]
   starting to become numb" and he "couldn't . . . feel [his] fingers").

27  [23] *Id*. at 58:8.

28  [24] *Id*. at 75:2-18.

1    **2.  Subsequent Administrative Appeal**

2        During the relevant time, the California Department of Corrections and Rehabilitation

3    ("CDCR") provided inmates with the following administrative remedies, also referred to as the

4    administrative grievance process. Cal. Code Regs. tit. 15, § 3481.[25] There are two levels of review

5    for non-healthcare appeals by inmates, referred to as a grievance and an appeal. At the first level,

6    the inmate submits a form CDCR 602-1 to the Institutional Office of Grievances at the prison or

7    other facility where he is housed. *See* Cal. Code Regs. tit. 15, § 3482(a), (c). Inmates must

8    "describe all information known and available to the claimant regarding the claim, including key

9    dates and times, names and titles of all involved staff members (or a description of those staff

10   members)" in the originally filed grievance. Cal. Code Regs. tit. 15, § 3482(c)(2).

11       After an inmate submits his grievance, the facility's "grievance Coordinator shall ensure that a

12   written grievance decision is completed no later than 60 calendar days after receipt of the

13   grievance." *Id*. at § 3483(g). If an inmate is dissatisfied by his facility's response, he may appeal to

14   the second level of review. *Id*. at § 3484(b). To do so, the inmate must appeal in writing, within 60

15   calendar days of the institution's response, to the Office of Appeals in Sacramento. *Id*. at §

16   3484(a). The Office of Appeals's "appeal Coordinator shall ensure that a written appeal decision is

17   completed no later than 60 calendar days." *Id*. at § 3485(g). Administrative remedies are not

18   exhausted where the grievance is rejected. *See* 15 Cal. Code Regs. §§ 3483(g)(6), 3845(g)(6).

19       Mr. Jackson filed a single grievance about the March 29, 2024 incident.[26] In it, he stated that

20   "Officer Candela [] maliciously secured the leg irons so tight on [Mr. Jackson's] ankles that [Mr.

21   Jackson had] no feeling on [his] left heel and toes." The grievance also complained of "staff

22   misconduct" by non-defendant Lieutenant Lawrence. The grievance did not mention defendant

23   Hughes, nor did it claim that the wrist restraints were too tight.[27]

24

25

26   [25] The versions of the regulations in effect between January 5, 2022 and December 31, 2024 control
     Mr. Jackson's claims and are quoted and discussed herein.

27   [26] MSJ, Ex. 8 ("Russell Declaration") at ¶ 6.

28   [27] *Id*., Ex. 1 at 7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Mr. Jackson received a response to his grievance. The response stated that, because the

2    grievance accused staff of misconduct, it would be referred to another department "outside the

3    grievance and appeal process." The response also stated that it "exhausts all administrative

4    remedies available to [Mr. Jackson] for *this claim*."[28]

5

6                                            **ANALYSIS**

7         The facts show that Mr. Jackson failed to exhaust any claim as to defendant Hughes, and that

8    defendant Candela did not inflict excessive force upon Mr. Jackson. Defendants accordingly are

9    entitled to summary judgment in their favor.

10

11   **1.  All Claims as to Defendant Hughes**

12        Defendants argue that Mr. Jackson's claim against defendant Hughes fails for want of

13   exhaustion.[29] The court agrees. Because the failure to exhaust is fatal to all of Mr. Jackson's

14   claims against defendant Hughes, the court need not consider defendants' other arguments against

15   defendant Hughes's liability. *See Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014) (en banc)

16   ("Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim.").

17        "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any

18   other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

19   such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in

20   prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002);

21   *Ross v. Blake*, 578 U.S. 632, 638-39 (2016) (mandatory language of § 1997e(a) forecloses judicial

22   discretion to craft exhaustion exceptions). All available remedies must be exhausted, and

23   exhaustion is a prerequisite to suit. *See Porter,* 534 U.S. at 524; *see also Booth v. Churner*, 532

24   U.S. 731, 741 (2001). District courts are without discretion to ignore a failure to exhaust. *See*

25   *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).

26

27   _____

     [28] *Id.*, Ex. 2 at 9 (emphasis added).

28   [29] MSJ at 7-10.

1    The PLRA's exhaustion requirement cannot be satisfied by filing a "procedurally defective

2    administrative grievance or appeal." *Id*. "Proper exhaustion demands compliance with an agency's

3    deadlines and other critical procedural rules . . . ." *Id*. at 90-91 (footnote omitted). Here, Mr.

4    Jackson was required to satisfy CDCR's procedural rules to exhaust.

5    CDCR requires inmates to list the "names and titles of all involved staff members (or a

6    description of those staff members)." Cal. Code Regs. tit. 15, § 3482(c)(2). Inmates must also

7    "describe all information known and available to the claimant regarding the claim." *Id*. In

8    addition, a grievance must at minimum "'alert[] the prison to the nature of the wrong for which

9    redress is sought'" and "put prison officials on notice of [the plaintiff's] complaint." *Morton v.*

10   *Hall*, 599 F.3d 942, 946 (9th Cir. 2010).

11   As noted above, Mr. Jackson's sole grievance regarding the March 29, 2024 incident does not

12   mention defendant Hughes at all. Nor does the grievance mention any tightness in the handcuffs

13   applied by defendant Hughes. Rather, the grievance complains of actions by non-defendant

14   Lieutenant Lawrence, and of the tightness of the leg restraints applied by defendant Candela.[30]

15   There thus is no information in the grievance which would alert CDCR to any wrongdoing by

16   defendant Hughes. Because Mr. Jackson did not comply with CDCR's procedural rule requiring

17   him to identify every wrongdoer in the original grievance, he did not exhaust any claim as to

18   defendant Hughes.

19   Mr. Jackson argues that defendants' exhaustion argument is "moot" because he mentioned the

20   incident log number in his grievance, and the response to his grievance "declared that [his]

21   administrative remedies were exhausted."[31] Mr. Jackson misunderstands the response. The

22   response stated that he had exhausted the "administrative remedies available to [him] for *this*

23   *claim*," but did not state that the grievance exhausts *any* claim Mr. Jackson could possibly have

24   relating to the March 29, 2024 incident.[32] Nor could the response so entirely dispense with the

25

26

27   [30] Russel Decl., Ex. 1 at 5-6.

     [31] ECF No. 24 ("Opposition") at 2.

28   [32] Russel Decl., Ex. 2 at 8 (emphasis added).

ORDER – No. 24-cv-02630-LB          7

1   exhaustion requirement; both CDCR regulations and Ninth Circuit precedent establish that an

2   inmate must name all wrongdoers and all wrongful events in the original grievance. *See* 15 Cal.

3   Code Regs. §§ 3482 (requiring inmates to name wrongdoers), 3483(l)(2) (stating that "a decision

4   of 'identified as staff misconduct'" means "*the claim* was exhausted," but not stating that any

5   possible claim was exhausted) (emphasis added); *Morton*, 599 F.3d at 946; *Sapp v. Kimbrell*, 623

6   F.3d 813, 824 (9th Cir. 2010) (holding that grievances must "provide the level of detail required

7   by the prison's regulations"). Because Mr. Jackson neither named all wrongdoers, nor gave the

8   prison any information which would suggest defendant Hughes behaved improperly, he failed to

9   exhaust any claim as to defendant Hughes.

10      Because Mr. Jackson failed to exhaust any claim against defendant Hughes, defendant Hughes

11  is entitled to summary judgment in his favor.

12

13  **2.  Eighth Amendment Claim as to Defendant Candela**

14      The unnecessary and wanton infliction of pain on a prisoner amounts to cruel and unusual

15  punishment prohibited by the Eight Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

16  "[W]henever prison officials stand accused of using excessive physical force in violation of the

17  Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied

18  in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause

19  harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). To be liable, a defendant must act "with

20  general intent" to cause harm. *Robins v. Meecham*, 60 F.3d 1436, 1441 (9th Cir. 1995).

21      In determining whether the use of force was for the purpose of maintaining or restoring

22  discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the

23  need for application of force, the relationship between that need and the amount of force used, the

24  extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any

25  efforts made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *see also*

26  *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to

27  need in each situation).

28

United States District Court
Northern District of California

1   Mr. Jackson's Eighth Amendment claim can be broken down into a challenge to defendants'

2   decision to apply wrist and ankle restraints, and a challenge to how those restraints were applied.

3   As to the decision to apply restraints, the facts show that defendants applied wrist and ankle

4   restraints in a good-faith effort to protect prison staff and Mr. Jackson himself. Staff had perceived

5   Mr. Jackson to be in a state of medical emergency, and so he had to be safely transported to the

6   medical unit for evaluation.[33] Mr. Jackson does not dispute this in his opposition and instead

7   appears to agree that he was in a state of medical emergency.[34] It thus is undisputed that Mr.

8   Jackson needed to exit his cell for medical evaluation. It also is undisputed that when non-

9   defendants Sergeant Fillippa and Lieutenant Lawrence attempted to extract Mr. Jackson from his

10  cell, Mr. Jackson "forcefully punched Lieutenant Lawrence in the face with a closed left fist,"

11  causing a concussion and a chin wound.[35] Thus, before defendant Candela applied restraints to

12  Mr. Jackson's ankles, other staff had determined that Mr. Jackson needed to be taken out of his

13  cell for a medical evaluation, and Mr. Jackson had battered a member of staff who was trying to

14  extract Mr. Jackson from the cell. Under these circumstances, that application of ankle restraints

15  shows "a good-faith effort to maintain or restore discipline," rather than a "malicious[] and

16  sadistic[] [effort] to cause harm." *Hudson*, 503 U.S. at 6-7.

17  As to how the restraints were applied, there is no evidence that the ankle restraints were

18  applied too tightly or that defendant Candela had the intent to cause any harm when he applied the

19  ankle restraints. The evidence suggests the opposite. First, defendant Candela declares that he

20  "used one of [his] thumbs as a spacer" to prevent applying the ankle restraints too tightly.[36] Mr.

21  Jackson does not dispute that assertion.[37] Second, Nurse Hewitt declares, and Mr. Jackson

22  confirmed in his deposition, that the restraints on both his wrists and his ankles were loose enough

23

24

[33] Jackson Depo. at 22:17-22, 25:1-23; Gutierrez Decl. at ¶¶ 3, 4.

25  [34] Opp.

26  [35] Fillippa Decl. at ¶ 10; Lawrence Decl. at ¶ 11.

27  [36] Candela Decl. at ¶ 9.

[37] Opp. (arguing his claims were exhausted, that non-defendant Lawrence failed to follow procedure,
28  and that he had sustained an injury to his wrist).

United States District Court
Northern District of California

1    that Nurse Hewitt "was able to raise the handcuff and leg restraint bracelets further up [Mr.]

2    Jackson's arms and legs so [she] could check his wrists and ankles."[38] Third, Mr. Jackson testified

3    in his deposition that he did not suffer injury to his ankles or legs.[39] Rather, he sustained nerve

4    damage to his fingers and now uses a wrist brace.[40] Fourth, Mr. Jackson did not tell defendant

5    Candela that the restraints had been applied too tightly; Mr. Jackson testified in his deposition that

6    he only ever complained about the tightness of the wrist restraints, and that complaint was made to

7    a non-defendant staff member.[41] As defendant Candela did not apply the restraints to Mr.

8    Jackson's wrists,[42] any tightness of those restraints cannot show an intent to harm on defendant

9    Candela's part.

10        Defendants have presented ample evidence, including Mr. Jackson's deposition testimony, that

11   the ankle restraints were not applied too tightly. Mr. Jackson has failed to produce any evidence

12   that the ankle restraints were too tight, or even to dispute defendant Candela's assertion that he

13   took steps to ensure that the ankle restraints were not applied too tightly. Because there is no

14   evidence that defendant Candela applied excessive force to Mr. Jackson's person, defendant

15   Candela is entitled to summary judgment.

16

17   **3.  First Amendment Claim**

18        In his Complaint, Mr. Jackson alleged that he filed a grievance about the March 29, 2024

19   incident, and that defendants subsequently told him he would be beaten if he continued to

20

21

---

22   [38] Hewitt Decl. at ¶ 13; *see also* Jackson Depo. at 58:22-59:2 (confirming that Nurse Hewitt was able to "move [the restraints] up" on both Mr. Jackson's wrists and ankles).

23   [39] Opp., Ex. 8 at 63:18-65:23 (discussing Mr. Jackson's continuing finger pain, but not discussing
24   continuing ankle or leg pain), 66:15-22 ("Q: . . . And you've spoken about pain in your left hand. What other injuries to you currently still suffer from, if any? A: That's pretty much it, sur, just the
25   nerve damage. Q: Do you have any pain or injuries in your feet or ankles? A: No, sir."), 69:1-3 ("Q: [Is] there any other pain or injury other than your left hand as you sit here today? A: No, sir.").

26   [40] *See id.*; *see also* Opp. at 3.

27   [41] Hughes Decl. at ¶¶ 14-15; Candela Decl. at ¶¶ 13-14; Fillippa Decl. at ¶¶ 20-21; Hewitt Decl. at ¶ 18; Jackson Depo. at 39:8-17; 47:2-7; 48:18-49:2; 54:22–55:4, 57:19-58:5.

28   [42] Fillippa Decl. at ¶¶ 10-13.

United States District Court
Northern District of California

complaint about the incident.[43] The court therefore concluded that Mr. Jackson had pleaded a

cognizable retaliation claim against defendants.[44]

In his deposition, Mr. Jackson admitted that he never filed a grievance regarding the alleged

threat.[45] Any First Amendment claim is thus unexhausted. Moreover, Mr. Jackson conceded that

he was threatened by two different officers who were not named as defendants to this action, and

that neither defendant threatened him.[46] Thus, even if this claim had been exhausted, it would fail

on the merits.

Defendants are entitled to summary judgment in their favor on Mr. Jackson's retaliation claim.

## CONCLUSION

Mr. Jackson has not identified any evidence to support his claims. In view of defendants'

undisputed evidence, including Mr. Jackson's own statements, no jury could find for Mr. Jackson.

The court grants defendants' motion for summary judgment.

The court directs the Clerk to close the file.

**IT IS SO ORDERED.**

Dated: September 5, 2025

_____

LAUREL BEELER
United States Magistrate Judge

---

[43] ECF No. 1 at 3-4.

[44] ECF No. 10 at 3.

[45] Jackson Depo. at 75:15-18.

[46] *Id*. at 75:2-6.